UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
AT CINCINNATI
CIVIL ACTION NO. 10-378-JGW

**MICHAEL BERRY, et al.**                                                                      **PLAINTIFFS**

**V.**

**FRANK'S AUTO BODY CARSTAR, INC., et al.**                          **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

Pending are plaintiffs' motion for partial summary judgment [Doc. 16] and defendants' motion for summary judgment.  Doc. 17.  Also pending are defendants' motion to strike portions of certain affidavits submitted by plaintiffs [Doc. 25] and plaintiffs' motion to strike a supplemental affidavit of defendant David Brinkman.  Doc. 31.  For the following reasons, defendants' motion for summary judgment will be granted as to counts one and two of plaintiffs' complaint; count three of plaintiffs' complaint will be dismissed without prejudice; plaintiffs' motion for partial summary judgment will be denied; and both motions to strike will be denied as moot.[1]

**I.  Factual and Procedural History**

Plaintiff Michael Berry ("Michael")[2] was employed by defendant Frank's Auto Body

---

[1] All parties have consented to disposition by the magistrate judge pursuant to 28 U.S.C. §636(c).  Doc. 5.

[2] Due to all five plaintiffs sharing the surname Berry, for clarity's sake I will refer to each plaintiff by his or her first name.  No disrespect is intended.  *See, e.g., Zibbell v. Michigan Dept. of Human Services*, 313 Fed.Appx. 843, 844 at n.1 (6th Cir. 2009) ("While we customarily refer to individuals by their last names, no disrespect is of course intended in referring to Zibbells, who share that surname, by their first names.").

Carstar, Inc. ("Carstar") from 2004 until September 2009. Throughout his employment Michael received medical insurance from Carstar. In June 2008, Michael's son Brennan (sometimes spelled "Brennen" in the record) was born. Initially, Brennan was a covered dependent on an insurance policy obtained by his mother, Jacqueline Berry ("Jacqueline"). Jacqueline became uninsured when she lost her job in October 2008. In December 2008, Michael and Jacqueline married. Beginning on January 1, 2009 Michael carried Jacqueline and his children (Brennan, Carson and Tanner) on the insurance policy he received from his employment at Carstar.

In May 2009, Brennan was hospitalized after losing the use of his arms. The next month Brennan was diagnosed as suffering from cerebral palsy and he began receiving daily medication and frequent physical therapy. Plaintiffs allege that Brinkman, the owner of Carstar, thereafter began complaining to Michael and/or Jacqueline about the insurance costs associated with Brennan's treatment.

On September 8, 2009 Michael was working at Carstar when he got into an argument with another employee, Kristie Chisenhall, at an office near the front of Carstar. Though witnesses reported that Chisenhall remained at least relatively calm, Michael became highly irate. Michael loudly called Chisenhall a "fat ass bitch," and told Chisenhall that she was stupid and nobody liked her. Michael screamed at Chisenhall to "shut the f*** up" and called her a "fat bitch." Michael told Chisenhall that "you'll get yours; you'll see" and told Chisenhall she should "go home to [her] fat f***ing family." Chisenhall felt harassed and physically threatened and stated that Michael lunged at her in what she perceived to be a threatening way. Lisa Wamprect, an employee of Carstar who witnessed the argument, stated that Michael "was lunging at the glass wall between he and Kristie [Chisenhall]" and that she (Wamprect) "was

scared of what he [Michael] was going to do." Doc. 24-2, p. 3. Tim Brengel, another employee of Carstar who witnessed the argument, stated that "all hell had broken loose." Doc. 17-1, p.3. Brengel also stated that Michael "kept smacking his hands together and lunging at her [Chisenhall]." *Id.* Brengel deemed Michael to have been "totally out of control." *Id.* Michael left Carstar's premises after the argument to pick up his children from daycare. After leaving Carstar, Michael screamed to Brinkman on the phone, "I told you to fire that fat bitch." Doc. 17-2, p. 4.

In his affidavit, Michael admits to having engaged in a shouting match with Chisenhall. Michael admitted yelling at Chisenhall to "shut up, fat bitch," to telling her to "shut the f*** up" and asking her why she did not "go home to your f***ing family." Doc. 20-1, p. 3. Michael contended, however, that his argument with Chisenhall "was not worse that [sic] a number of other arguments I had witnessed, or even participated in." *Id.* In responses to requests for admission, Michael denied lunging at Chisenhall during the argument in question, but admitted making hand gestures toward her. Doc. 17-2, p.6.

Brinkman suspended Michael and Chisenhall and retained an independent human resources consultant, Jody Forman, to conduct an investigation. Forman interviewed witnesses[3] and ultimately recommended that Carstar terminate Michael's employment. Carstar terminated Michael's employment on September 12, 2009–three days after the argument he had with Chisenhall.

---

[3]Plaintiffs attack Forman's investigation by pointing out that Forman did not interview Michael. But Brinkman testified at his deposition that Forman interviewed Brengel and Wamprect and Chisenhall and did not interview Michael because the versions of events related by Brengel, Wamprect and Chisenhall matched. Doc. 18, p. 18.

Concerned about insurance coverage, Jacqueline later contacted Brinkman to ascertain how to obtain COBRA insurance coverage.  Eventually, Brinkman directed Jacqueline to speak to Philip DuBois, Carstar's insurance broker.  Dubois ultimately agreed to keep the Berrys on Carstar's health plan through the end of that year if they (the Berrys) paid the premiums.  The Berrys were insured through Carstar's policy with Anthem until April 2010, when Michael obtained health insurance from his new employer.

In June 2010, Michael, Jacqueline and their three minor children (Brennan, Carson and Tanner) (collectively "Plaintiffs") brought this action against Carstar and Brinkman (collectively "Defendants"), raising three causes of action.  First, plaintiffs allege retaliatory termination in violation of the Employee Retirement Income Security Act ("ERISA").  Second, plaintiffs allege defendants violated plaintiffs' COBRA rights by failing to notify them of their COBRA rights.  Third, plaintiffs allege defendants discriminated against Michael on the basis of his association with Brennan, in violation of Ohio Revised code ("ORC") 4112.02(A) and 4112.99.

**II. Analysis**

**A. Motions to Strike**

Defendants ask the Court to strike portions of affidavits offered by plaintiffs on hearsay grounds.  Doc. 25.[4]  Plaintiffs contend the material in question is not inadmissible hearsay as it is offered "for the purpose of demonstrating notice of the falsity of DuBois' assertion that plaintiffs were receiving their full COBRA benefits[,]" Doc. 25, p.2, and showing notice is an admissible purpose for using out-of-court statements.  *See, e.g., United States v. Cosgrove*, 637 F.3d 646,

---

[4]The motion to strike contained as document twenty-five in the record is an expanded version of a similar motion to strike contained as document twenty-two.  Both motions will be denied as moot.

4

657-58 (6th Cir. 2011). Hearsay cannot be considered when ruling on a motion for summary judgment. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994). But motions to strike are disfavored;[5] a Court should ignore inadmissible evidence instead of striking it from the record. *See, e.g., Lombard v. MCI Telecommunications Corp.*, 13 F.Supp.2d 621, 625 (N.D. Ohio 1998). Because the motions for summary judgment may be properly resolved without consideration of the materials in question, the Court need not definitively determine whether the materials are inadmissible hearsay.

Similarly, defendants seek to strike a portion of Jacqueline's second affidavit in which she states that Brinkman said, "you guys are killing me on insurance." According to defendants, that statement is inadmissible because it is contradictory to Jacqueline's deposition testimony in which she testified only that Brinkman said "you guys are killing me" with no reference to insurance. *See, e.g., Penny v. United Parcel Service*, 128 F.3d 408, 415 (6th Cir. 1997) ("a party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony."). However, as defendants are entitled to summary judgment even if the entire phrase "you guys are killing me on insurance" is considered, the motion to strike may be denied as moot.

Defendants also seek to strike exhibit C to Jacqueline's deposition, a document purporting to be a letter to Michael from Anthem insurance. *See* Doc. 16-2, p.65. Defendants contend the document should be stricken because it is unauthenticated and "[o]nly authenticated documents may be considered on summary judgment." *Green v. Throckmorton*, 2010 WL 4279191, at *9 (S.D. Ohio Oct. 22, 2010). Plaintiffs assert the document is properly

---

[5]*See, e.g., Hayes v. Dye*, 2010 WL 3515578, at *12 (E.D.Ky. Sept. 2, 2010).

5

authenticated via circumstantial evidence as Jacqueline asked an Anthem representative to send a letter documenting their conversation and she received exhibit C in response. Again, however, the Court need not resolve that argument because the motions for summary judgment may be adequately and properly resolved without consideration of the exhibit in question.

In their motion to strike, plaintiffs seek to strike a supplemental affidavit of Brinkman, as well as portions of defendants' reply to plaintiffs' response to defendants' motion for summary judgment, because Brinkman refers to a decision of the Ohio Unemployment Compensation Review Commission. Doc. 31. Plaintiffs' argument is based on ORC §4141.281(D)(8), which provides in relevant part that no finding of fact or law in an unemployment proceeding "shall be given collateral estoppel or res judicata effect in any separate or subsequent judicial . . . proceeding . . . ." Defendants contend that statute is inapplicable because they are merely using the decisions denying Michael's claim for unemployment to demonstrate that they had a basis to terminate Michael, but are not relying on those unemployment decisions to completely preclude Michael's claims in this action. The Court need not resolve this claim based entirely on Ohio state law because defendants are entitled to summary judgment, even if the unemployment-related evidence is not considered by the Court.

### B. Summary Judgment

Plaintiffs ask for summary judgment on only count two of their complaint, which contends defendants failed to notify plaintiffs of their COBRA rights. Defendants seek complete summary judgment on all counts.

### 1. Standard of Review

Summary judgment is proper only if the facts on file with the court demonstrate not only

that no genuine issue of material fact remains to be resolved but also that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party may discharge its burden by "pointing out . . . an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party cannot rest on its pleadings, but must identify specific facts that remain for the finder of fact at trial. *See id.* at 324. Although all inferences are drawn in favor of the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986), the nonmoving party must present significant and probative evidence in support of its complaint. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

The court's function is not to weigh the evidence and determine the truth of the matters asserted, but to determine whether a genuine issue of material fact remains for a fact finder at trial. *Id.* at 249. The inquiry is whether the evidence presents a "sufficient disagreement to require submission [of the case] to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The court reviewing a summary judgment motion need not search the record in an effort to establish the lack of genuinely disputed material facts. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404-07 (6th Cir. 1992). Rather, the burden is on the nonmoving party to present affirmative evidence to defeat a properly supported motion, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989), and to designate specific facts that are in dispute. *Anderson*, 477 U.S. at 250; *Guarino*, 980 F.2d at 404-05.

### 2. Count One: ERISA Retaliation

29 U.S.C. §1140 generally prohibits any person from discriminating against a participant or beneficiary for exercising his or her rights under an employee benefit plan. In order to state a

claim for ERISA retaliation, a plaintiff must demonstrate "through either direct or circumstantial evidence" that a defendant "had a specific intent to violate ERISA . . . ." *Schweitzer v. Teamsters Local 100*, 413 F.3d 533, 537 (6th Cir. 2005). The Sixth Circuit "defines direct evidence as 'that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Id.* (quoting *Jacklyn v. Schering-Plough Healthcare Prods., Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). As plaintiffs do not have direct evidence of defendants' intent to violate ERISA, the Court must use the burden-shifting approach utilized to resolve indirect evidence claims.[6]

Under the burden-shifting approach, plaintiffs must first make a *prima facie* case of retaliation. To do so, they must show that (1) they were engaged in activity protected by ERISA; (2) they suffered an adverse employment action; and (3) there is a causal link between the protected activity and the employer's adverse action. *See, e.g., Hamilton v. Starcom Mediavest Group, Inc.*, 522 F.3d 623, 628 (6th Cir. 2008). If plaintiffs make a prima facie case, the burden shifts to defendants to "articulate a legitimate reason" for the adverse employment action. *Id.* If defendants articulate a legitimate reason, the burden again shifts and plaintiffs "must show that

---

[6]Plaintiffs argue that Brinkman's purported comment to Jacqueline that the Berrys were "killing me" regarding insurance, and DuBois's purported statement that Brinkman was concerned that the Berrys were costing him a lot of money constitute direct evidence of discrimination. But, even disregarding defendants' previously discussed objections to the statements, the statements simply are not of sufficient clarity and force to require a conclusion that Michael was terminated for discriminatory reasons. Statements of concern regarding insurance costs do not compel a conclusion that an employee was terminated due to those costs, especially since Michael was not terminated until after he engaged in the heated argument with Chisenhall. At most, the statements could theoretically give rise to an inference that Michael was terminated at least in part due to his high insurance costs, but "direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice . . . ." *Schweitzer*, 413 F.3d at 537 (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)).

the articulated reason was a pretext for retaliation." *Id.*

Defendants contend that plaintiffs have not established a prima facie case. But even if the Court assumes, solely for purposes of argument, that plaintiffs have made a prima facie case, defendants are still entitled to summary judgment because plaintiffs have not shown that defendants' legitimate reason for terminating Michael (the argument with Chisenhall) was a pretext. In order to demonstrate that an employer's stated reason for taking an adverse employment action is actually a pretext, a plaintiff must show either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the adverse employment action, or (3) that the proffered reasons were insufficient to motivate the adverse employment action. *See, e.g., Poff v. Chattanooga Group, Inc.*, 912 F.Supp. 298, 305 (E.D.Tenn. 1996) (citing *Manzler v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

Defendants contend Michael was terminated because he engaged in a loud, threatening and profane argument with Chisenhall. Defendants also point out that they terminated Michael based on the independent advice of Forman.

Plaintiffs contend that a review of the entire record demonstrates the argument with Chisenhall was a mere pretext for Michael's termination. Specifically, plaintiffs rely upon: Brinkman's and DuBois's aforementioned statements regarding the high costs of the Berrys' insurance claims due to Brennan's therapy; the lack of discipline imposed upon Michael for prior altercations with Chisenhall; defendants' prior discharge of an employee "under false pretenses after she fainted and hit her head"; and Forman's purported disinterest in obtaining Michael's

9

side of the story, as evidenced by Forman's failure to speak personally to Michael.

Defendants do not deny that Michael had argued with Chisenhall in the past, but point out that the argument which led to Michael's termination was different than previous arguments between Michael and Chisenhall. As Brinkman testified in his deposition, other arguments or disagreements were not shouting matches. Doc. 18, p. 11-12. Even in a light most favorable to Michael, the argument which led to his termination involved him repeatedly screaming insults and profanities while making hand gestures toward Chisenhall. Others have averred that they were scared by Michael's seemingly out of control behavior during the argument but that Chisenhall did not raise her voice. There is no evidence that during any previous argument with Chisenhall, Michael threatened her that she would "get" hers or that he made hand gestures and/or lunged at her. Accordingly, it cannot be said that defendants tolerated similar misconduct in the past by Michael without having taken corrective action as the argument which led to Michael's termination was of a greater scope and degree of ferocity than past disagreements.

Moreover, Brennan's diagnosis preceded Michael's termination by a few months. Since Michael contends that office disagreements were not uncommon, defendants could have terminated Michael at a time far closer to Brennan's diagnosis (and before Brennan had incurred significant medical bills) if defendants' true intent was to fire Michael to avoid paying for Brennan's care. Instead, Michael was not terminated until months after Brennan's diagnosis but only three days after the argument with Chisenhall. Additionally, Brinkman avers in his affidavit that "at the time of his termination, I was unaware of the amount [Carstar] paid in health insurance for the Berry family or the claims history for the berry [sic] family." Doc. 17-5, p. 150.

In his second affidavit, Michael asserts that Brinkman told him (Michael) "on at least five different occasions something to the effect that 'My lawyer says I should get rid of Lawson because her disability makes her a liability.'" Doc. 20-1, p. 314.  Defendants argue that the information regarding the former employee is irrelevant and inadmissible.  Even if the statement is, solely for purposes of argument, deemed admissible plaintiffs are not entitled to relief.  It is unclear why Brinkman's attorney allegedly believed the employee's disability was a liability for Brinkman, but there is no mention in the statement of a need to terminate the employee due to high insurance premiums or medical costs. The alleged statement, therefore, cannot be construed to support Michael's contention that he was terminated because of Brennan's costly medical treatment.

Finally, the Court rejects plaintiffs' contention that the holdings in the distinguishable cases of *Fitzgerald v. Action, Inc.*, 521 F.3d 867 (8th Cir. 2008) and *Chappell v. Butterfield-Odin Sch. Dist. No. 836*, 673 F.Supp.2d 818 (D.Minn. 2009) are sufficient to defeat defendants' motion for summary judgment.  In *Fitzgerald*, the Eighth Circuit held that "[w]here an employer tolerates an undesirable condition for an extended period of time, and then, shortly after the employee takes part in protected conduct, takes an adverse action in purported reliance on the long-standing undesirable condition, a reasonable jury can infer the adverse action is based on the protected conduct."  521 F.3d at 875.  *Chappell* followed the rationale from *Fitzgerald*.  *See* 673 F.Supp.2d at 841.  Even assuming, solely for purposes of argument, that the rationale of *Fitzgerald* and *Chappell* should be followed by this Court, plaintiffs are not entitled to relief.

In *Fitzgerald*, "only a few days elapsed between Fitzgerald's notification of his intent to have surgery and Action's decision to terminate him" and "the reason Action gave for

11

terminating Fitzgerald-accumulated misconduct-had existed for months before Fitzgerald notified Action of his surgery." 521 F.3d at 875. Similarly, in *Chappell*, the employer "tolerated Chappell's allegedly contentious and insubordinate behavior for several weeks, and then, one day after Chappell engaged in protected conduct by complaining of discrimination, ask[ed] her to resign and suspended her when she refused." 673 F.Supp.2d at 841.

In the case at hand, however, Michael's termination came months after the exercise of his protected activity (usage of health insurance benefits for Brennan). To reiterate, the stated reason given by defendants for Michael's termination–the extremely loud, threatening and profane argument with Chisenhall–was not the same type of conduct previously tolerated by defendants. Instead, as defendants note, the event with Chisenhall was "not merely the same 'undesirable condition' present before [Michael's] termination . . . ." Doc. 24, p. 10-11.

The Court concludes, therefore, that plaintiffs have failed to demonstrate that defendants' stated reason for terminating Michael was a mere pretext. Defendants are entitled to summary judgment on plaintiffs' ERISA retaliation claim.

### 3.  Count Two: Failure to Provide COBRA Notification

Plaintiffs contend they are entitled to summary judgment on their claim that defendants failed to provide them (plaintiffs) with notice of their COBRA rights. Because Michael was terminated for gross misconduct, which is not a qualifying event triggering COBRA notification, I agree with defendants that plaintiffs were not entitled to COBRA notification.

COBRA "generally requires that group health plans sponsored by employers with twenty or more employees offer covered employees and their families the opportunity for a temporary extension of health coverage in certain instances where coverage under the plan would otherwise

end." *Shrimpton v. Quest Diagnostics, Inc.*, 2011 WL 2604749, at *4 (N.D.Ohio Jan. 24, 2011). Those certain instances are known as qualifying events. 29 U.S.C. § 1166(a)(2) generally requires an employer to notify an administrator of a qualifying event within thirty days of its occurrence. A qualifying event, for purposes of this action, means "[t]he termination (other than by reason of such employee's gross misconduct) . . . of the covered employee's employment." 29 U.S.C. §1163(1). A plan administrator generally must notify any qualified beneficiary of his or her rights within fourteen days. 29 U.S.C. §1166(a)(4), (c). The plan administrator is not relieved of his or her notification duty even if the employee has knowledge of his COBRA rights. *McDowell v. Krawchison*, 125 F.3d 954, 960 (6th Cir. 1997). "Likewise, any qualified beneficiary's knowledge of his or her rights does not affect the statutory duty to notify that beneficiary." *Id.* In other words, a plan administrator is also obligated to provide notification to an employee's covered spouse. *Id.* at 959-60. The precise method of notice is not specified in the relevant statutes. *Id.* at 958. Instead, the Sixth Circuit has held that "the notice given must be sufficient to allow the qualified beneficiary to make an informed decision whether to elect coverage." *Id.*

Defendants contend Michael was terminated for gross misconduct. Accordingly, defendants contend no COBRA notification was necessary. *See* 29 U.S.C. §1163(2) (defining a qualifying event in relevant part as termination of employment "other than by reason of such employee's gross misconduct . . . ."); *Shrimpton*, 2011 WL 2604749, at *4 ("if an employee is terminated for conduct that constitutes gross misconduct under COBRA, the administrator of the group health plan is not required to notify the terminated employee and his family that they may elect to continue coverage under the plan."). I agree.

The term "gross misconduct" is not statutorily defined, and courts have not come to a universal definition of the term. *Zickafoose v. UB Services, Inc.*, 23 F.Supp.2d 652, 655 (S.D.W.Va. 1998) ("No uniform definition of gross misconduct exists."). Courts have generally defined gross misconduct as conduct "so outrageous that is shocks the conscience[,]" *id.*, or as "misconduct that is 'intentional, wanton, willful, deliberate, reckless or in deliberate indifference to an employer's interest.'" *Nero v. University Hospitals Management Services Org.*, 2006 WL 2933957, at *4 (N.D.Ohio Oct. 12, 2006) (quoting *Collins v. Aggreko, Inc.*, 884 F.Supp. 450, 454 (D.Utah 1995)). Mere negligence, incompetence or inadvertent misbehavior does not constitute gross misconduct. *Moore v. Williams College*, 702 F.Supp.2d 19, 24 (D.Mass. 2010). Accordingly, courts have found gross misconduct to be present in situations such as: "where a drunken employee crashed an employer-provided car; where an employee called a co-worker a racial slur and threw an apple at her; where an employee battered a co-worker, placing her in the hospital; where an employee stole from her employer; and where an employee repeatedly and persistently refused to follow the instructions of his supervisor . . . ." *Id.* (collecting cases) (citations omitted).

Michael's misconduct was not inadvertent, nor did it stem from negligence or incompetence. Screaming profanities at another employee, making hand gestures toward the employee (which others believed to be threatening), saying the employee would "get" hers and generally seeming to be out of control is conduct so manifestly so outrageous and extreme as to constitute gross misconduct. Indeed, plaintiffs do not cite a case in which similar behavior was not deemed to constitute gross misconduct. Since Michael engaged in gross misconduct, he was statutorily not entitled to COBRA notice.

Plaintiffs contend that Jacqueline was entitled to proper notice, even if Michael was not. Plaintiffs stress that the Sixth Circuit has held that spouses are entitled to proper COBRA notice. *McDowell*, 125 F.3d at 960.  But *McDowell* did not involve a termination for gross misconduct. Instead, other courts have persuasively held that "if an employee is terminated for conduct that constitutes gross misconduct under COBRA, the administrator of the group health plan is not required to notify the terminated employee and his family that they may elect to continue coverage under the plan."  *Shrimpton*, 2011 WL 2604749, at *4 (collecting cases); *Misna v. Unitel Communications, Inc.*, 41 F.3d 1124, 1129 (7th Cir. 1994) (reversing district court's ruling that employee's spouse was entitled to COBRA notice even if employee was terminated for gross misconduct because "[u]nder COBRA, an employer must give notice and extend continuation coverage only after the occurrence of a qualifying event.  The statute explicitly excludes termination for gross misconduct as a qualifying event.  Nowhere does the statute indicate that a qualified beneficiary has a right to notice in any circumstance other than a qualifying event.  We cannot look to legislative history to demand more of employers than Congress has seen fit to require.") (citations omitted).  In short, because no qualifying event occurred, neither Michael nor Jacqueline (nor their children) were entitled to COBRA notice. Defendants are entitled to summary judgment on Count Two of plaintiffs' complaint and plaintiffs' motion for partial summary judgment on Count Two will be denied.

### 4. Count Three: Discrimination on Basis of Association with Brennan

In Count Three of their complaint, plaintiffs rely solely upon Ohio law for their allegation that defendants "purposely discriminated against [Michael] on the basis of his association with his son [Brennan] by terminating [Michael] in order to avoid higher insurance

15

rates arising from the medical costs incurred in the treatment of Berry's son's disability." Doc. 1, p.5. Whether Ohio law permits an associational discrimination claim is an issue upon which courts have not agreed. Nonetheless, because defendants are entitled to summary judgment on all of plaintiffs' federal causes of action, this state law cause of action will be dismissed without prejudice.

ORC §4112.02(A) generally prohibits an employer from discriminating against a person based on the person's disability. ORC §4112.99 provides that anyone who violates that chapter "is subject to a civil action for damages, injunctive relief, or any other appropriate relief."

Courts have not been unanimous in determining whether Ohio law permits a claim for associational discrimination. The Sixth Circuit unambiguously held that, unlike the federal Americans with Disabilities Act, "[t]he Ohio handicap discrimination statute contains no comparable prohibition against associational discrimination." *Smith v. Hinkle Mfg., Inc.*, 36 Fed.Appx. 825, 830 (6th Cir. 2002). This Court has followed the holding of *Smith*,[7] as has the Northern District of Ohio.[8]

However, this Court recently issued an opinion holding that Ohio law does permit a claim of associational discrimination. *Maxwell v. City of Columbus*, 2011 WL 2493525

---

[7]*See, e.g., Winkelmann v. Big Lots Stores, Inc.*, 2009 WL 3788673, at *1 (S.D.Ohio Nov. 10, 2009) ("the Ohio discrimination statute, unlike federal law, contains no prohibition against associational discrimination.").

[8]*Baker v. City of Toledo, Ohio*, 2007 WL 1101254, at *6 (N.D.Ohio Apr. 11, 2007) ("The Ohio statute contains no similar provision for 'associational disabilities' and, therefore the Court holds there is no such claim under state law."); *Anthony v. United Telephone Co. of Ohio*, 277 F.Supp.2d 763, 776 (N.D.Ohio 2002) (holding employer entitled to summary judgment on state law claim of associational discrimination because Ohio law does not recognize such a claim).

16

(S.D.Ohio June 21, 2011). *Maxwell*, which involved a claim of discrimination based upon association with African-American co-workers, did not cite the Sixth Circuit's opinion in *Smith*. Instead, *Maxwell* cited and relied upon the Ohio Court of Appeals' opinion in *Cole v. Seafare Enterprises, Ltd., Inc.*, 1996 WL 60970 (Ohio Ct. App. Feb. 14, 1996). *Cole* also involved a claim of discrimination based upon association with African-Americans. The court in *Cole* stated that it was "confronted with the issue of whether R.C. 4112.02(A) prohibits discrimination based on association." *Id.* at *1. The court noted that "[o]n its face, the statute prohibits discriminatory actions against a person on the basis of certain enumerated characteristics of that person. A claim of discrimination based on association, however, would be based on a prohibition against discriminatory action taken toward a person on the basis of an enumerated characteristic of the person's associates." *Id.*

Nonetheless, the Ohio Court of Appeals held that associational discrimination claims were permissible under ORC §4112.02(A) because the Ohio Supreme Court had rejected an argument that associational discrimination claims were not permissible under ORC §4112.02 (specifically, subsection G, involving public accommodations). *See Ohio Civil Rights Comm. v. Lysyj*, 313 N.E.2d 3 (Ohio 1974). In reliance upon *Lysyj*, the Court of Appeals held as follows in *Cole*:

> We believe that the Ohio Supreme Court's decision in *Lysyj* mandates the disposition of the case sub judice in Cole's favor. We discern no reason to interpret two sections of the same statute differently merely because one speaks to employment and the other addresses public accommodations. The intent of the statute is the same in all sections: to prohibit discrimination. Therefore, the Ohio Supreme Court's interpretation of R.C. 4112.02(G) to include a proscription against discrimination based on association must be applied to R.C. 4112.02(A).

*Cole*, 1996 WL 60970, at *2.

17

The Sixth Circuit did not discuss either *Lysyj* or *Cole* in *Smith*.[9] Instead, the Sixth Circuit only cited ORC §4112.02 to support its holding that no associational discrimination claim is permissible under Ohio law. Even though *Lysyj* or *Cole* involve claims of associational discrimination based upon race, those cases' holdings would arguably apply to Michael's claim of associational discrimination based upon Brennan's disability.

Interesting though the issue is, it is not necessary for this Court to decide whether plaintiffs' state law associational discrimination claim is viable. Because defendants should be granted summary judgment on plaintiff's federal claims, the Court has the discretion to decline to exercise supplemental jurisdiction over plaintiff's state law claims. *See, e.g., Zimmerman v. Crabtree*, 2010 WL 2572058, at *5 (S.D.Ohio May 27, 2010). Indeed, the Sixth Circuit has stated it generally does not favor a district court retaining jurisdiction over state law claims if federal question claims are resolved before trial. *See, e.g., Gaff v. Federal Deposit Ins. Corp.*, 814 F.2d 311, 319 (6th Cir. 1987) ("It is generally recognized that where, as in this case, federal issues are dismissed before trial, district courts should decline to exercise pendent jurisdiction over state law claims."). Accordingly, plaintiffs' state law associational discrimination claims will be dismissed without prejudice. *See, e.g., Zimmerman*, 2010 WL 2572058 at *6

### III. Conclusion and Order

For the reasons state herein, **IT IS ORDERED**:

1. Plaintiffs' motion for partial summary judgment [Doc. 16] is **denied**; and

2. Defendants' motion for summary judgment [Doc. 17] is **granted** as to Counts One

---

[9]Similarly, neither this Court nor the Northern District of Ohio addressed *Lysyj* or *Cole* when holding, in reliance upon *Smith*, that Ohio law did not support a claim of associational discrimination.

and Two of plaintiffs' complaint; and

    3.  Count Three of plaintiffs' complaint is **dismissed without prejudice**; and

    4.  Defendants' motions to strike [Docs. 22, 25] and plaintiffs' motion to strike [Doc. 31]

are  **denied as moot**; and

    5.  A separate judgment will be issued herewith.

This the 19th day of September, 2011.          <u>s/ J. Gregory Wehrman</u>
                                                                             J. Gregory Wehrman
                                                                             United States Magistrate Judge